***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the prior Opinion and Award. Accordingly, the Full Commission AFFIRMS, with modifications, the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and of the subject matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for defendant-employer in this claim was Chartis Insurance.
5. Plaintiff alleges to have sustained a compensable injury to her bilateral shoulders, arm, elbows, wrists, neck and hands as a result of repetitive motion and use peculiar to her employment pursuant to N.C. Gen. Stat. § 97-53 on or about 27 October 2009.
6. Defendants filed a Form 63 citing payment of medical compensation without prejudice on 27 April 2009.
7. An employment relationship existed between plaintiff and defendant-employer on 27 October 2008.
8. Plaintiff filed a Form 33 Request for Hearing on 25 September 2009, citing that defendants unfairly terminated plaintiff and that plaintiff continues to look for work within her restrictions without success and is disabled under Russell v.Lowes.
9. Defendants filed a Form 33R on 21 October 2009, citing that plaintiff received all benefits to which she was entitled under the North Carolina Workers' Compensation Act and that plaintiff had not shown ongoing disability as defined under Russell v.Lowes.
10. Subsequent to the hearing, the parties stipulated that plaintiff's average weekly wage was $650.20, yielding a compensation rate of $433.36 per week.
 ***********
The following were entered into by the parties as: *Page 3 
 EXHIBITS
1. A collection of documents including Industrial Commission Forms and filings, Medical records, and discovery information, collectively paginated 1-134 and marked as stipulated exhibit 1.
2. Four DVDs containing videos of job tasks, marked as stipulated exhibit 2.
3. Plaintiff's personnel file, collectively paginated 139-463 and marked as stipulated exhibit 3.
4. Plaintiff's job search records, collectively paginated 465-478 and marked as plaintiff's exhibit 1.
 *********** ISSUES
1. Whether Plaintiff sustained an injury by accident and/or an occupational disease of her bilateral shoulders, arms, elbows, wrists, and hands arising out of and in the course and scope of her employment with defendant-employer on or about 27 October 2008, and, if so, what are the compensable consequences, if any?
2. Whether defendants should be sanctioned for their failure to adhere to Rule 601 and N.C. Gen. Stat. § 97-18(d)?
3. Whether plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
4. Whether the suggested need for an arthroscopic decompression of the left shoulder is related to plaintiff's compensation occupational disease?
5. Whether plaintiff constructively refused suitable employment?
6. Whether plaintiff is unable to secure suitable alternative employment following her termination because of restrictions or limitations she is under due to her alleged workers' *Page 4 
compensation injury?
7. Whether plaintiff has shown reasonable efforts to obtain employment?
 ***********
Given the foregoing stipulations, and based upon the preponderance of the evidence in view of the entire record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 41 years old. Plaintiff is five feet, nine inches tall. She has a high school diploma, a cosmetology diploma, a CNA certificate, and an effective teacher training certificate. These diplomas and certificates are all from community colleges. She has previously worked in the health field with kidney dialysis patients, in retail, and as a hairdresser. Plaintiff also worked as a team leader with Dal-Tile and as a coach with autistic individuals in a group home.
2. Plaintiff began working for defendant-employer on 3 May 1999 as a machine operator. In this job plaintiff produced telephone wires and power cables. Her shifts were from 6:00 a.m. to 3:30 p.m., and included a 30-minute lunch break at noon and two ten-minute breaks in the morning. Plaintiff worked occasional overtime on Fridays and Saturdays, but never more than a ten-hour shift. Plaintiff was terminated from her employment with defendant-employer on 19 March 2009.
3. Plaintiff's assigned tasks for defendant-employer included operating machines such as the universal cable loop, the urban tie bender, the hairpin bender, the spool tie bender, and the OG bender. Every job plaintiff performed for defendant-employer involved hand/arm movement with her neck in a downward flexed position. When she operated the machines, she moved her arms and wrists repeatedly and looked down, turning her head left and right *Page 5 
repeatedly while watching her work. Plaintiff's work area was approximately at waist level on most machines.
4. During a two to three month period prior to 27 October 2008, plaintiff's wrists, shoulders, and neck began to hurt. She bought hand-warmers to put on her neck to alleviate the strain resulting from constantly working at the machines. She self-medicated with Ibuprofen rather than report the problem to occupational health. She began experiencing elbow and neck pain approximately 30 minutes to an hour into her shift as a result of the repetitious work. Plaintiff also experienced pain during nights and mornings.
5. On 27 October 2008, plaintiff complained of elbow pain to a safety personnel team member and was sent to Stanly Regional Medical Center. There, Larry Roediger, PA, diagnosed plaintiff with epicondylitis and assigned work restrictions of no repetitive motions with the left and right arm for two to three weeks.
6. On 28 October 2008, defendant-employer provided plaintiff a light-duty packing job that did not require lifting over five pounds. Plaintiff returned to Mr. Roediger and was provided the same restrictions on 11 November 2008. Because plaintiff continued to have elbow pain, Mr. Roediger referred plaintiff to orthopedist, Dr. Joseph Zucker. Dr. Zucker diagnosed plaintiff with right lateral epicondylitis greater than the left, gave plaintiff a cortisone injection in her right elbow, and prescribed a "tennis elbow" strap. Dr. Zucker further recommended that plaintiff perform home exercises and continue her use of Ibuprofin. He also returned plaintiff to full-duty work.
7. Plaintiff had a history of attendance problems with defendant-employer, being tardy or absent from work at least 134 times during the eleven years she was employed. Defendant-employer participated in numerous conferences with plaintiff to correct her *Page 6 
attendance problems and plaintiff was provided numerous warnings regarding her behavior. Plaintiff admitted she had a problem with her attendance and tardiness and that she understood that she could be terminated for her conduct. On 25 February 2009, plaintiff missed work and was given a final written warning and disciplinary layoff. She was warned that additional attendance problems would warrant immediate discharge.
8. Because of her continued symptoms, plaintiff requested to go back to the doctor, and defendants sent her to Dr. Shadley Schiffern with Northeast Orthopedics. Dr. Schiffern diagnosed bilateral elbow lateral epicondylitis and left shoulder impingement syndrome. Plaintiff was placed back on light duty — being tasked with wiping down parts. While performing this job, her neck was still flexed forward as she looked down at her work. Plaintiff continued to experience pain while she was working at this light duty job, even though she was allowed to work at her own pace.
9. On 9 March 2009, plaintiff presented to Pilakel's Rehab Services, Inc. for physical therapy upon referral by Dr. Schiffern. Plaintiff reported left elbow pain, left shoulder pain, neck pain, as well as pain between her shoulder blades to Dr. Pilakel. Plaintiff began a 24-session treatment program with Dr. Pilakel.
10. On 19 March 2009, plaintiff was late to work for defendant-employer due to childcare issues. Immediately upon arrival, she went to her supervisor and explained what had happened. Plaintiff worked until about 1:15 p.m., at which time she was told to go see her supervisor. Plaintiff met with her supervisor and the production manager, and they informed plaintiff that she was terminated.
11. Because of the circumstances surrounding plaintiff's return to work with restrictions and her subsequent termination while plaintiff was under work restrictions as well as *Page 7 
undergoing physical therapy, it has not been established that plaintiff's termination was for a reason unrelated to her neck and left shoulder conditions, for which a non-injured employee would have been terminated.
12. On 27 March 2009 plaintiff filed an initial Form 18 indicating that she sustained injuries to both elbows and arms on 27 October 2008 while working for defendant-employer as a machine operator and that the injury was caused by operating the machine over long periods of time. On 27 April 2009, defendants filed a Form 63 Notice of Payment of Compensation Without Prejudice. This form reflected that plaintiff's claim was for an occupational disease to "both elbows and arms." Defendants classified this as a "medical only" claim.
13. Plaintiff filed a second Form 18 Notice of Accident to the Employer on 28 April 2009, alleging that she had sustained injuries bilaterally to her shoulders, arms, elbows, wrists, and hands secondary to the repetitive motions necessary when operating defendant-employer's machines. Specifically, plaintiff was required, on a repetitive basis, to insert cable into the machine with her right hand and reaching and pulling the cable out with her left hand.
14. Plaintiff returned to Dr. Schiffern on 15 May 2009, at which time the MRI of her left shoulder was reviewed. Dr. Schiffern noted that the MRI showed evidence of some tendinopathy within the left shoulder in the supraspinatus region and that there were some early degenerative changes present at the acromioclavicular joint. Dr. Schiffern opined that a component of plaintiff's pain could be originating from cervical radiculopathy and recommended an MRI of the cervical spine to evaluate for possible spondylotic changes versus a herniated disc as the source of plaintiff's symptoms. As a result plaintiff added the neck as a body part in issue at the hearing before the Deputy Commissioner.
15. Plaintiff returned to Dr. Schiffern on 5 June 2009 complaining of ongoing pain in *Page 8 
her left shoulder as well as pain down in her left elbow; some left sided neck pain; left shoulder pain worse followed by her elbow; and the subsiding of her neck pain somewhat. Dr. Schiffern indicated that the MRI of the cervical spine showed evidence of some disc herniation present at the C5-C6 level with evidence of left sided foraminal stenosis; that plaintiff continued to have impingement signs present in the left shoulder; that she had evidence of "tennis elbow" findings with pain over the lateral epicondyle and pain with resisted wrist extension; and that plaintiff had a negative Spurling's sign. Dr. Schiffern assessed left shoulder impingement syndrome; left elbow lateral epicondylitis; and a left C5-C6 herniated disc.
16. On 29 July 2009, plaintiff presented to Dr. Schiffern and reported ongoing pain within her left shoulder and pain in her neck. Dr. Schiffern injected the subacromial space of the left shoulder with Lidocaine, Marcaine, and Celestone and referred plaintiff to Dr. Michael Meighen for evaluation and discussion of further treatment options for her neck pain and cervical herniated disc. Dr. Schiffern continued plaintiff on restrictions of no heavy lifting with the left arm, no pushing, pulling, or carrying, and light duty work only.
17. On 10 August 2009, plaintiff presented to Dr. Michael Meighen. Following an examination and review of the MRI reports of the left shoulder and cervical spine, Dr. Meighen assessed cervicalgia, HNP at C5-C6, left paracentral, and left shoulder pain/impingement. Dr. Meighen recommended a physical therapy regimen for plaintiff's cervical spine and work restrictions to include limited lifting to 10-15 pounds and alternate sitting and/or standing. Defendants paid for the physical therapy for plaintiff's neck with Dr. Pilakel.
18. Dr. Meighen opined that plaintiff's shoulder condition was mechanical with no abnormalities found through an MRI or x-rays. He further opined that had plaintiff not had an additional cervical issue, he would have released her to full duty. Dr. Meighen would not *Page 9 
confirm to a reasonable degree of medical certainty that plaintiff's work duties caused her shoulder problems or placed her at a greater risk of developing mechanical symptoms in her shoulder than the general public.
19. Plaintiff had a cervical injection and noted good relief in her symptoms for approximately one day, but then the pain slowly returned. Defendants paid for this injection. Dr. Meighen recommended that plaintiff undergo a surgical consultation with Dr. Brian Rose and opined that plaintiff should continue with work restrictions of lifting limited to 10-15 pounds and pushing and pulling limited to 10-15 pounds.
20. On 22 October 2009, plaintiff presented to Dr. Rose for an evaluation of neck pain and left arm pain that radiated down to the level of the elbow region. Dr. Rose diagnosed a C5-C6 herniated disc, C5-C6 degenerative disc disease, neck pain, and left C5 radiculopathy. Dr. Rose recommended a C5-C6 anterior cervical discectomy and fusion with instrumentation. Plaintiff wanted to undergo this procedure. Defendants refused to authorize the surgery.
21. Dr. Rose continued to prescribe plaintiff pain medication while she waited for approval on the surgery. Defendant-carrier paid for this medication. The pain medication did not help, so Dr. Rose referred plaintiff to pain management. As of the date of the hearing before the Deputy Commissioner, Plaintiff had not yet attended pain management.
22. Dr. Rose opined that, biomechanically, flexing one's neck puts pressure on the discs in the cervical spine. If this action is done repetitively a significant amount of times, this action will increase the rate of deterioration of the discs in the cervical spine. He further noted that repeated rotation of the neck from left to right with flexion would further increase the stress on the disc. Dr. Rose also noted that while individuals' discs tend to dry out as they get older, not everybody eventually requires fusion surgery such as he recommended for plaintiff. *Page 10 
23. Dr. Rose opined that plaintiff's work activity exposed her to a greater risk than the general public to developing a symptomatic disc condition. The mechanism of twisting the head from side to side while in a flexed position exposes a normal individual to a greater risk of having the onset of disc desiccation and its progression as compared to the general public. Plaintiff's work activity was a significant contributing factor to plaintiff's disc condition requiring surgery. The major cause of plaintiff's neck injury was repetitive motion. Dr. Rose also opined that it would be unlikely for plaintiff to have a herniated disc at such a young age, and that he has noted as an expert that there is a direct relation between the frequency of repetitive motion and disc degeneration.
24. Jerri Patterson, ANP-C testified in this matter as an expert nurse practitioner in the field of pain management. Ms. Patterson reviewed all of plaintiff's medical records before she saw plaintiff for the first time on 14 June 2010, and she classified plaintiff's pain management prior to that date as reasonable. Ms. Patterson noted that plaintiff's pain wakes her up during the night such that she is not able to sleep. Ms. Patterson opined that this disruption of the sleep cycle can increase a patient's pain and lead to depression and anxiety. Because plaintiff is involved in this type of pain cycle, Ms. Patterson is attempting to break it with sleep medication and anxiety medication.
25. Ms. Patterson placed plaintiff on a mild drug for her anxiety, but recommends that plaintiff have the surgery if that is what has been recommended by the neurosurgeon or spine specialist, because plaintiff had gone through a good course of pain management to date. Ms. Patterson opined that plaintiff needs to remain in pain management until she is able to undergo the surgery.
26. Dr. Pilakel testified in this matter as an expert in the field of physical therapy. Plaintiff described to Dr. Pilakel that she had to hold her neck in a flexed forward position, looking down, when she was doing her work for defendant-employer. Dr. Pilakel opined that this constant *Page 11 
flexion would put stress on the discs between the vertebrae. This posture compresses the discs into an abnormal position. This also puts an extension strain on the neck muscles. Dr. Pilakel further opined that, more probably than not, plaintiff's job with defendant-employer exposed her to a greater risk of damage to the discs than a desk job would, especially because of the repetitive movements that plaintiff was performing.
27. Dr. Pilakel also opined that the work materially contributed to plaintiff's development of the problems that he saw in her when he first evaluated her on 9 March 2009. He noted that the type of job plaintiff was doing, with the constant flexion of her neck, is what caused her problems in the neck. Lastly, Dr. Pilakel opined that plaintiff was not ready to be in a job for eight hours per day when he released her from his care on 30 September 2009.
28. Plaintiff applied for unemployment benefits in April 2009 and began receiving benefits three weeks after she was terminated from employment. She began drawing $352.00 per week on 7 July 2009, and continues to receive these benefits. As part of plaintiff's requirements for unemployment benefits, plaintiff kept a job search log. This log indicates that she has been unable to find work suitable to her capacity. Given plaintiff's continued complaints of pain, sleep disruption, anxiety, work restrictions, and the need for surgery, plaintiff's inability to obtain work is due at least in part to her physical limitations and the restrictions consequent of her work-related conditions. Plaintiff has made significant, reasonable efforts to obtain suitable employment. These efforts have been unsuccessful.
29. Having considered the testimony of Drs. Rose, Pilakel, and Meighen, along with the circumstances of their involvement with plaintiff's treatment, the Full Commission gives greater weight to the testimony and expert opinions of Drs. Rose and Pilakel.
30. The preponderance of the evidence in view of the entire record shows that the *Page 12 
conditions plaintiff developed in her neck and left shoulder conditions is peculiar to and characteristic of plaintiff's repetitive-motion job for defendant-employer and that the general public is not equally exposed.
31. The preponderance of the evidence in view of the entire record shows that plaintiff's repetitive-motion job for defendant-employer placed her at increased risk of developing her neck and left shoulder conditions as compared to the general public not so employed.
32. The preponderance of the evidence in view of the entire record shows that plaintiff's repetitive-motion job for defendant-employer caused or significantly contributed to the development of her neck and left shoulder conditions.
33. By 27 October 2008, plaintiff suffered a compensable occupational disease as a result of the repetitive motion of the work assigned to and performed by plaintiff for defendant-employer. Defendants admitted the compensability of the injuries to plaintiff's hands and elbows by means of a Form 63 filed on 27 April 2009.
34. Plaintiff has not reached maximum medical improvement for her conditions and is in need of further medical treatment to lessen her pain and her period of disability from her compensable neck, left shoulder, and arm conditions.
35. Plaintiff's average weekly wage was $650.20, yielding a compensation rate of $433.36 per week.
36. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground.
37. Plaintiff received unemployment benefits for which defendants are entitled to a credit. *Page 13 
 ***********
Given the foregoing stipulations and findings of fact, based upon the preponderance of the record in view of the entire record, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Defendants previously admitted the compensability of plaintiff's bilateral arm and elbow conditions. N.C. Gen. Stat. § 97-18(d).
2. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), plaintiff must establish both increased risk and causation by the preponderance of the evidence in view of the entire record. N.C. Gen. Stat. §§ 97-53(13); 97-84;Rutledge v. Tutlex Corp., 308 N.C. 85, 93 (1983); Fann v.Burlington Indust., 59 N.C.App. 512 (1982); Booker v. DukeMedical Center, 297 N.C. 458 (1979).
3. Increased risk is proved by showing by the preponderance of the evidence in view of the entire record: (1) that the disease is "characteristic of" and "peculiar to" individuals engaged in the claimant's particular trade or occupation; and (2) that the disease is not one to which the general public is equally exposed.Booker v. Duke Medical Center, 297 N.C. 458 (1979). "A disease is `characteristic' of a profession when there is a "recognizable link" between the nature of the job and an increased risk of contracting the disease in question." Id. at 472. A disease is "peculiar to the occupation" when the conditions of the employment result in a hazard which distinguishes it in character from employment generally. Id. at 473.
4. Having shown that plaintiff's neck and left shoulder conditions were characteristic of and peculiar to her work for defendant-employer, and that the general public is not equally exposed to contracting these conditions, plaintiff in this case has proven by the preponderance of the evidence in view of the entire record that plaintiff's job working for *Page 14 
defendant-employer placed her at increased risk than the general public of developing her neck and left shoulder conditions. N.C. Gen. Stat. §§ 97-53(13); 97-84; Rutledge v. Tutlex Corp.,308 N.C. 85, 93 (1983); Booker v. Duke Medical Center,297 N.C. 458 (1979).
5. Plaintiff in this case has proven by the preponderance of the evidence in view of the entire record that the tasks required by plaintiff's job working for defendant-employer caused or significantly contributed to the development of her neck and left shoulder conditions. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tutlex Corp., 308 N.C. 85, 93 (1983), Fann v. BurlingtonIndust., 59 N.C.App. 512 (1982); Booker v. Duke MedicalCenter, 297 N.C. 458 (1979).
6. According to Russell, plaintiff can prove disability four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. N.C. Gen. Stat. § 97-84; Russell v. Lowe's ProductDistribution, 108 N.C. App. 762 (1993). In the present case the evidence shows that, after a reasonable effort on her part, as a result of her compensable conditions, plaintiff has been unsuccessful in her reasonable efforts to obtain suitable employment.
7. In view of the entire record, given the preponderance of the medical and vocational evidence, plaintiff was totally disabled as a result of her compensable occupational disease and was unable to earn any wages in any employment 19 March 2009 *Page 15 
and continuing and is entitled to compensation at the rate of $433.36 per week during the period from 19 March 2009 and continuing. N.C. Gen. Stat. § 97-29; Russell v. Lowes Prod.Distribution, 108 N.C. App. 762 (1993).
8. Because of the circumstances surrounding plaintiff's return to work with restrictions and subsequent termination while working in a light duty capacity as well as undergoing physical therapy, it has not been established that plaintiff's termination was for a reason unrelated to her compensable conditions, for which a non-injured employee would have been terminated. McRae v. Toastmaster,Inc., 358 N.C. 488, 499 (2004); Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228 (1996).
9. Defendants are entitled to a credit for the unemployment benefits plaintiff received. N.C. Gen. Stat. §§ 97-42, 97-42.1.
10. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1, including the surgery recommended by Dr. Rose and subsequent rehabilitation, and continuing pain management as recommended by plaintiff's treating physicians. N.C. Gen. Stat. § 97-2(19).
11. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground. N.C. Gen. Stat. § 97-88.1. Plaintiff is not entitled to sanctions against defendants pursuant to N.C. Gen. Stat. §§ 97-88, 97-88.1 or 97-88.197-18(d).
 ***********
Given the foregoing stipulations, findings of fact, and conclusions of law, based upon the preponderance of the record in view of the entire record, the Full Commission enters the following: *Page 16 
 AWARD
1. Subject to a reasonable attorney's fee herein approved and a credit for unemployment benefits paid to plaintiff, defendants shall pay temporary total disability compensation to plaintiff at the rate of $433.36 per week for the period beginning 19 March 2009 and continuing. As much of said compensation as has accrued shall be paid in a lump sum.
2. Defendants shall pay medical expenses incurred or to be incurred when medical bills have been submitted according to established Industrial Commission procedures. This medical treatment shall include but is not limited to the surgery recommended by Dr. Rose and subsequent rehabilitation, and continuing pain management as recommended by plaintiff's treating physicians.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 1 of this Award is hereby approved to be deducted from the lump sum due plaintiff and paid directly to counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. As plaintiff has not reached maximum medical improvement, this Opinion does not address permanent partial disability. In the event that the parties should be unable to agree on the amount of permanent partial disability compensation that may be due plaintiff, either party may request a hearing from the Commission to resolve this matter.
5. No attorney's fees are appropriate to be awarded in this matter under N.C. Gen. Stat. § 97-88 or N.C. Gen. Stat. § 97-88.1. Plaintiff is not entitled to sanctions against defendants pursuant to N.C. Gen. Stat. § 97-18(d).
6. Defendants shall pay the costs.
This the ___ day of _____ 2011. *Page 17 
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1